UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

| | | |
|---|---|---|
| SHELLY KERRY, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | 2:17-CV-376-LEW |
| | ) | |
| SUN LIFE FINANCIAL (US) SERVICES | ) | |
| INC., | ) | |
| | ) | |
| Defendant | | |

## DECISION AND ORDER ON DEFENDANT'S
## MOTION FOR SUMMARY JUDGMENT

In this diversity action, the Plaintiff, Shelly Kerry, alleges the Defendant, Sun Life

Financial (U.S.) Services Company, Inc. retaliated against her in violation of the Maine

Human Rights Act ("MHRA") for engaging in activity protected under the Maine

Whistleblower Protection Act ("MWPA") and failed to accommodate Plaintiff's alleged

disability in violation of the MHRA. Am. Compl. (Doc. No. 14). Defendant moves for

summary judgment on the claims, asserting that the termination of Kerry's employment

violated neither the MWP nor the MHRA. Mot. Summ. J. (Doc. No. 33). I grant the

motion for the reasons set forth in this Decision and Order.

## FACTS

The facts are drawn from the parties' stipulations, if any, and from their statements

of material facts submitted in accordance with Local Rule 56. The Court will adopt a

statement of fact if it is admitted by the opposing party and is material to the dispute. If a

statement is denied or qualified by the opposing party, or if an evidentiary objection is raised concerning the record evidence cited in support of a statement, the Court will review those portions of the summary judgment record cited by the parties, and will accept, for summary judgment purposes, the factual assertion that is most favorable to the party opposing the entry of summary judgment, provided that the record material cited in support of the assertion is of evidentiary quality and is capable of supporting the party's assertion, either directly or through reasonable inference. D. Me. Loc. R. 56; *Boudreau v. Lussier*, 901 F.3d 65, 69 (1st Cir. 2018). If not supported by a specific citation to the record, I will disregard a statement of fact, denial, or qualification. *Richardson v. Mabus*, 203 F. Supp. 3d 86, 104 (D. Me. 2016).[1]

Sun Life hired Plaintiff on August 3, 2015, to serve as a Senior Consultant, Long Term Disability Claims ("LTD") on the Behavioral Health Claims Team. Joint Statement

---

[1] Local Rule 56 requires the opposing party to "support each denial or qualification by a record citation as required by this rule." D. Me. Loc. R. 56(c); *see also* D. Me. Loc. R. 56(f) ("The court may disregard any statement of fact not supported by a specific citation to record material properly considered on summary judgment. The court shall have no independent duty to search or consider any part of the record not specifically referenced in the parties' separate statement of facts"). Here, Kerry has failed to comply with the dictates of Rule 56 on various occasions, for example, by citing her own statement rather than the record, when opposing certain of Defendant's statements. (Pl.'s Response to Def.'s Stmt. of Material Facts ¶¶ 30, 32-34, 50, 62-63, 65, 72, 74, 75, 83, 85, 98, 99-102, 104, 109.) This approach quite clearly violated Local Rule 56 and I have disregarded her improperly supported assertions. As explained in *Richardson v. Mabus*:

> It follows that [a party's] qualification is improperly supported because [s]he cites to [her] statement of additional material facts instead of record evidence. Even if there is a citation to record evidence within a cited statement of additional material facts or separate statement of facts, the Court must flip to that statement, find the record evidence, then consider the other party's response thereto, along with its record evidence. In other words, [the party's] shortcut requires the Court to take the long way round and transforms summary judgment practice from the intended point, counterpoint process into an entanglement of cross-references. What was discrete becomes messy.

203 F. Supp. 3d 86, 103 n.22 (D. Me. 2016).

of Material Stipulated Facts ("JSMSF") ¶¶ 9, 12. In this position, Kerry reported to Rebecca Moya, the Senior Manager, LTD, who, in turn, reported to Lisa Doherty, Director, LTD. *Id.* ¶ 10.

When Kerry was offered her position, she received a copy of Sun Life's Employee Handbook. Defendant's Statement of Material Facts ("DSMF") ¶¶ 3, 9. She also had access to this handbook on the Sun Life intranet site. DSMF ¶ 10. The handbook outlined Sun Life's prohibition on retaliation as well as specific procedures for requesting a medical accommodation.[2] DSMF ¶¶ 7, 8.

On November 18, 2015, Moya tasked Kerry with the responsibility of writing her first denial letter for a claim that Sun Life initially approved but would deny going forward based on the determination that the claimant's need for long-term disability benefits was not medically supported. DSMF ¶ 29. Following her review, Kerry advised Moya that she felt Sun Life should conduct an additional investigation into whether or not the claimant should be required to pay back prior benefits received due to his receipt of other income. DSMF ¶ 30. In response to Kerry's concerns, Moya explained that Sun Life made the decision to not expend claims resources on an in-depth investigation because it was unlikely the claimant's income exceeded the level at which Sun Life could require repayment of benefits received. DSMF ¶ 31. Kerry strongly disagreed with Sun Life's

---

[2] The medical accommodation policy required employees to submit documentation from their health care provider outlining (1) "[t]he specific nature of the medical condition and . . . how it is negatively impacting the employee's ability to perform his/her job," (2) the accommodations the health care provider recommended as well as an explanation of how the accommodations would assist the employee, and (3) "the length of time that any such accommodation(s) will be needed." DSMF ¶ 8.

actions and she expressed her perspective that every claim should be investigated equally and that it was not appropriate for Sun Life to make a business decision to forgo the expense of further investigation.[3]  DSMF ¶ 32.

In her later statements on the topic, Kerry asserted that the "Fair Claims Act" requires insurers such as Sun Life to investigate all claims equally, which, in her view, necessitated additional investigation into the claimant's work history.  Deposition of Shelly Kerry-Feagans 53:2-10 (Doc. No. 24-1, #315) ("Kerry Dep."). Furthermore, she asserted it was illegal under the Fair Claims Act to make a business decision to forego additional investigation into the claim.[4]  DSMF ¶ 32; Kerry Aff. ¶ 5 (Doc. No. 41, # 1036); Kerry Dep. 55:14-16 (Doc. No. 24-1, #315).   However, when voicing her concerns to Moya, Kerry admits she never explicitly mentioned any law, including the misnamed "Fair Claims Act."  Kerry Dep. 55:5-7 (Doc. No. 24-1, # 315); Rosenstein Decl. ¶¶ 15-16 (Doc. No. 34-9, #841).  Instead, she questioned whether the handling of the claim fell within "fair claims processing," which, based on Kerry's later clarification, was a component of the "Fair

---

[3] Kerry has provided an exposition on her personal perspective in response to Defendant's statement that Moya did not believe it made "business sense" to launch an investigation into the claimant's work history. Response to DSMF ¶ 31.  Although the response is not actually responsive to the specific fact asserted by Defendant, and is rather a form of argument, in summary Kerry contends that the claimant's LTD benefit required total disability, which would in her view be inconsistent with the claimant's ability to wait tables; that she was concerned the claimant could be fraudulently receiving governmental disability benefits at the same time; that economic considerations or business judgments about the costs and benefits of an investigation should not drive the decision whether to investigate; that the Plan's health could be negatively impacted by the failure to explore the possibility of recoupment; and that the omission of an investigation would produce an "unkept" file, which might suggest carelessness or arbitrariness.

[4] As explanation for this stance, Kerry stated: "It is not fair to require some claimants to provide all information for proof of their disability claim and then not follow through with a thorough investigation on another claimant who may not even be disabled, and he may have been overpaid, because it is not financially worth it. In addition, it is not fair to the customer of the Long Term Disability policy (the employer who is actually paying Sun Life to administer their claims in accordance with the Fair Claims Practice), because their rates will increase." PSMF ¶ 18.

Claims Act," by which Kerry evidently means the Unfair Claims Settlement Practices provision of the Maine Insurance Code, 24-A M.R.S.A. § 2436-A. DSMF ¶ 36; Kerry Dep. 55:7-12 (Doc. No. 24-1, #315).

Despite these concerns, Kerry sent a follow-up email to Moya later that day which stated: "I did not think you advised [the individual who made the decision to deny the claim] to do the wrong thing. Sorry if it came off like that. I would never do that." DSMF ¶ 33. A month later, Kerry emailed Moya's supervisor, Doherty, regarding the claim and stated: "This is not to say I believe it's right or wrong, I just wanted to explain that it[']s an adjustment for me and I am trying to do the best I can with it." DSMF ¶ 34. Furthermore, she later characterized the issue to Human Resources representatives as a "mistake handled by my manager and another analyst." DSMF ¶ 50; Rosenstein Decl. Ex. 2, 2 (Doc. No. 34-14, #947).

Kerry asserts that from this point forward, Moya began to treat her poorly and became hostile towards Kerry. Plaintiff's Statement of Material Facts ("PSMF") ¶ 38. Kerry asserts this hostility was manifested in many ways, including Moya "chang[ing] her tone to sound angry" or stern, Moya referring to Kerry as "Ms. Shelly" in a sarcastic tone, or Moya generally trying to intimidate her. PSMF ¶¶ 38-40, 42. As examples of this new hostility, Kerry points to two separate meetings with Moya.

First, on December 14, 2015, Moya scheduled a meeting with Kerry "to ensure [she was] keeping track of [her] claims and [her] workload." DSMF ¶ 22. Nearly a month prior to this request, Kerry had been assigned a claim, had discussed the claim with Moya, and had even performed work on the claim. DSMF ¶ 22. However, on December 14, 2015,

Kerry reached out to Moya because she was unsure whether she was responsible for the claim. DSMF ¶ 22. Because Moya believed Kerry should have known about the assigned claim, she requested a telephone meeting. DSMF ¶ 22. On December 15, 2015, Moya called Kerry as planned and Kerry answered the call at her desk. DSMF ¶ 23. Among other topics of discussion, Moya asked Kerry about the condition of her health and Kerry disclosed she was suffering from an earache at the time. DSMF ¶¶ 23, 27. Although she was allegedly uncomfortable with the topic, Kerry did not express her uneasiness during the call and did not inform Moya that she was sitting at her desk (a public area where others may be able to overhear the conversation). DSMF ¶ 24. Following the call, Kerry emailed Moya and expressed her discomfort with discussing her health during the call as well as Moya's failure to warn her regarding the content of their meeting. DSMF ¶ 25; PSMF ¶ 42. In a follow-up meeting, Kerry explained to Moya that she felt as though Moya was "trying to intimidate her and find a reason to fire her." PSMF ¶ 42.

Second, in late December 2015, Moya and her manager, Doherty, requested Kerry travel to Portsmouth during inclement weather to meet with them.[5] DSMF ¶ 39; PSMF ¶ 47. During this meeting, Moya and Doherty provided Kerry with a review that outlined several concerns they had with Kerry's work performance[6] and they discussed those

---

[5] The parties hotly contest the nature of this meeting—whether it is properly characterized as a year-end review or a six-month evaluation conducted after only five months of experience with the company. DSMF ¶ 39; PSMF ¶ 48. In my view, this distinction is irrelevant.

[6] The listed performance issues included: (a) lack of timeliness on claims decisions and written communications on claims, including follow-up letters for burden of proof; (b) failure to follow policies and procedures regarding ongoing communication with the claimant on a consistent basis, including failure to complete claimant telephone interviews within 5 business days of receipt of the claim and/or to document when she was unable to reach a claimant within that time frame; (c) failure to effectively follow directions for handling claims; and (d) failure to achieve a full caseload. DSMF ¶ 40.

concerns.  DSMF ¶ 40; Kerry Dep. Ex. 10 (Doc. No. 24-11, #457-59).  Kerry denies that

the performance issues existed, instead asserting that she had been unaware of any

performance issues.[7]  PSMF ¶ 48.  Furthermore, Kerry asserts that Moya conducted the

meeting in an "intimidating" manner and even "yell[ed] at [Kerry] in an unprofessional

manner."[8]  PSMF ¶¶ 46, 49.  At the close of this meeting, Moya and Doherty agreed to set

up additional training for Kerry to address the performance issues they discussed. DSMF

¶ 41.

On January 11, 2016, Kerry left on an approved leave of absence to undergo surgery

to address a thyroid condition.  DSMF ¶ 42.  Kerry was initially scheduled to return to

work on February 19, 2016, but post-surgical complications delayed her return to work.

DSMF ¶ 42; JSMSF ¶ 13.  Kerry was subsequently approved to receive benefits under Sun

Life's Short-Term Salary Continuance ("STSC") Program through February 29, 2016.

JSMSF ¶ 14; DSMF ¶ 44.  After a request for an additional extension due to continued

post-surgical complications, Kerry was approved to receive STSC benefits through March

31, 2016.  DSMF ¶¶ 44, 69, 70.

While on leave, Kerry reached out to Sun Life's Human Resources department with

concerns regarding her manager, Moya.  DSMF ¶ 46.  In her initial email request to HR,

Kerry indicated she would like to speak with the Human Resources department about

---

[7] To support her denial of performance issues, Kerry recounts that she reached out to Moya's supervisor, Doherty, to discuss how she was being treated by Moya following the claim denial. PSMF ¶ 43. During that conversation, Kerry claims Doherty reassured her she was doing well, had no issues with Kerry's performance, and even discussed the potential of Kerry applying for a leadership role within Sun Life. PSMF ¶¶ 44-45, 48.

[8] The Defendants object to this characterization of Moya's actions during the meeting. PSMF ¶ 49.

"returning to work soon with another manager." DSMF ¶ 46; Rosenstein Decl. ¶ 11-12 (Doc. No. 34-9, #840). Although Kerry asserts in her summary judgment affidavit that she was requesting an accommodation because she felt anxiety due to the perceived retaliation from Moya, Kerry Aff. ¶ 13 (Doc. No. 41, #1038); PSMF ¶ 58, in fact, Kerry consistently requested an accommodation due to Moya's alleged retaliation and inappropriate conduct. Response to PSMF ¶ 58; Rosenstein Decl. ¶ 29 (Doc. No. 34-9, # 844); Rosenstein Decl. Ex. 2 (Doc. No. 34-14, #946-47) (Kerry requested to be transferred to a new manager so that she would "not be treated in an unfair way or be assessed unfairly."). In one correspondence, Kerry even stated: "I will not be returning to work for [] Moya. It is not due to a medical condition." Rosenstein Decl. Ex. 20 (Doc. No. 31-7, # 703).

Kerry asserts, and Defendant does not dispute, that she was diagnosed with intermittent anxiety in 2012 or 2013. PSMF ¶ 56. Additionally, there is evidence she informed Erin Blackburn, a Sun Life HR Representative, that she "was having some anxiety about returning to work for somebody that treated [her] that way." Kerry Dep. 137:13-25; 140:12-141:8 (Doc. No. 24-1, #336-37); Kerry Aff. ¶ 12 (Doc. No. 41, #1038). Whether this supports Plaintiff's assertion that she "requested an accommodation for her anxiety exacerbated by the conditions at work," PSMF ¶ 58, is a legal question to be addressed below. In her deposition, Blackburn asserts she was not aware Kerry was receiving treatment for anxiety and did not understand Kerry was requesting an accommodation for her anxiety. Blackburn Dep. 29:6-18 (Doc No. 24-34, #591). Similarly, another HR Representative, Lyn Rosenstein, states in her affidavit "Kerry never advised Sun Life Human Resources, either orally or in writing, that she was being

medically treated for or had been diagnosed with any type of anxiety disorder." Response to PSMF ¶ 58; Rosenstein Decl. ¶ 28 (Doc. No. 34-9, # 844). In opposition, Plaintiff cites her deposition testimony that she requested a transfer because of her anxiety. Kerry Dep. 137:13-25.

Following Kerry's emailed request for a new supervisor, the Sun Life HR department conducted an investigation into Kerry's concerns. DSMF ¶ 48. Throughout the investigation process, HR representatives frequently communicated with Kerry by email and over the phone, exchanged emails with Moya regarding Kerry's concerns, reviewed documentation provided by both Kerry and Moya, and interviewed Kerry and Moya's coworkers. DSMF ¶¶ 53-58.

In the long series of email exchanges and phone conversations between Kerry and Sun Life HR representatives, Kerry repeatedly voiced her concerns and memorialized them in writing. In sum, these communications focused on Kerry's frequent request for the accommodation of being reassigned to a new manager and Kerry's frustration over the general breakdown of Moya and Kerry's working relationship.[9]

At the conclusion of their investigation, the HR team determined that they could best address and resolve Kerry's concerns by having her return to work and by providing

---

[9] In one such email, Kerry listed many concerns, including: (i) her disagreement with the work performance issues discussed during the meeting, (ii) her concerns regarding the "critical" theme of the meeting, (iii) her frustration with the overall tone of the meeting, and (iv) her frustration with Moya "cut[ting] her off when she spoke. Rosenstein Decl. Ex. 2 (Doc. No. 34-14, #946-47). In addition to these concerns relating to the December 2015 meeting, Kerry also expressed more overarching concerns including: (i) complaints that she had not been given appropriate training in her role, (ii) frustration because her concerns are not "listened to" by her manager, Moya, (iii) concerns that she cannot give Moya feedback because Moya will "turn on her," and finally, (iv) a request to be transferred to a new manager so that she would "not be treated in an unfair way or be assessed unfairly." Rosenstein Decl. Ex. 2 (Doc. No. 34-14, #946-47).

support including: additional training on the systems Kerry was required to use when completing her job assignments, meeting with Kerry to resolve her concerns in person, and meeting with Moya and Kerry (both individually and together) in order to rehabilitate their working relationship. DSMF ¶¶ 59, 62. The HR team determined there was no evidence Moya had taken any retaliatory actions against Kerry, but nevertheless instructed Moya that she could not retaliate against Kerry for raising concerns regarding Moya. DSMF ¶ 60, 61, 92-94; Rosenstein Decl. ¶ 19 (Doc. No. 34-9, #842). Additionally, the HR team determined that Kerry's request to be transferred to a different manager in the Scarborough Office should be denied because (1) they believed that Kerry's unhappiness over Moya's actions did not warrant the accommodation of being transferred to another manager and (2) Moya was the only manager on the Behavioral Health Claims Team, so there was no other manager to whom Kerry could be transferred within her department. DSMF ¶ 62; Rosenstein Decl. ¶ 27 (Doc. No. 34-9, #844).

On March 11, 2016, a Sun Life HR representative emailed Kerry to notify her of their conclusions, request that she return to work, and update her regarding their proposed plan for remedying her concerns. DSMF ¶ 63.

On March 12, 2016, Kerry responded via email and voiced frustrations regarding the HR department's handling of the investigation as well as the March 11 email which, she believed, provided an inadequate response to her concerns. DSMF ¶ 64. Kerry also expressed that she could not be expected to return to work because her concerns had not been fully resolved. DSMF ¶ 64.

In a second series of emails stretching from March 2016 until May 2016, Kerry repeatedly contested the adequacy of Sun Life's response to her concerns and reaffirmed that she would not return to work if Moya was to be her manager, once again citing concerns of retaliation and unprofessionalism. DSMF ¶¶ 66, 71, 73, 77; PSMF ¶¶ 53-55. In one such email, Kerry stated "Moya is not an honest person and has been targeting me and retaliating. She has been unprofessional and demeaning. I will not work for an abusive Manager who continues to be dishonest." DSMF ¶ 73. In another, she stated she was justified in remaining out of work due to her allegations, among others, that (1) she had been treated unfairly by Moya, (2) she believed Moya tried to intimidate her and, in retaliation, made false statements on her review, (3) Moya had been unprofessional at work, (4) and Moya had treated her differently than other team members by buying gifts for other employees but not Kerry, "unfriending" Kerry on Facebook but not "unfriending" other employees, not wishing Kerry a Happy Birthday as she did with other employees, and not signing Kerry's Get Well card. DSMF ¶ 77; PSMF ¶¶ 53-55. In yet another, she stated:

> I had hoped for [a] reasonable resolution and request[ed] to be transferred to another manager in Scarborough. . . . I do not want to work for a company like this who does not find issues like the ones I have raised not serious . . . . Please let me be very clear to you again. I will not be returning to work for [] Moya. It is not due to a medical condition.

DSMF ¶ 75; Rosenstein Decl. Ex. 20 (Doc. No. 31-7, # 699-703).

In response to Kerry's emails, the Sun Life HR Representatives addressed Kerry's concerns, asserted it was appropriate for Kerry to continue under Moya's supervision, and consistently requested she return to work and engage in in-person meetings to resolve the

dispute.  DSMF ¶¶ 65, 67, 68, 72, 74, 76.  In the first of these emails, the HR representative
stated:

> Employees who raise concerns about performance criticism by their manager
> are expected to report to work, to continue to report to that manager, and to
> participate in good faith efforts to resolve concerns. Where, for example, an
> employee disagrees with a year-end performance review, Human Resources
> will meet with both the employee and the manager (separately and together)
> in an effort to resolve those issues. You need to return to work so that this
> process can commence.

DSMF ¶ 65.  These demands became more pointed as time went on, indicating that Kerry
was "not authorized to be out of work" and further, repeatedly reminding her that if she
continued to refuse to return to work, Sun Life may terminate her employment for job
abandonment.  DSMF ¶ 76; Rosenstein Decl. Ex. 12, 1 (Doc. No. 34-24, #970); Rosenstein
Decl. Ex. 13, 14 (Doc. No. 34-25, #985).

On May 19, 2016, Sun Life HR representatives sent Kerry a notice of termination
of employment.  DSMF ¶ 83.  In this letter, the HR representative stated:

> We are sorry that you believe that the Company has not responded
> adequately to your concerns. We respectfully disagree. We have requested
> on a number of occasions that you return to work and have advised you that
> any remaining outstanding issues between [Moya] and you will be addressed
> with HR at that time. However, you have refused to return to work. As a
> result, the Company is terminating your employment.

Rosenstein Decl. Ex. 23, 2 (Doc. No. 34-35, #1012).  On May 20, 2016, Kerry responded
with a letter again providing a detailed response focusing on her disagreements with Sun
Life's handling of her concerns and once again reiterating her refusal to return to work
under the supervision of Moya. DSMF ¶ 84.

In her deposition, when asked whether she believed the reason for termination—her
refusal to return to work for Moya—was false, Kerry responded: "That was the reason. No,

I don't believe that's false, no." DSMF ¶ 85; Kerry Dep. 119:1-8 (Doc. No. 24-1, # 331).

Moreover, at the time of her termination, Kerry had been medically cleared to return to work. DSMF ¶ 109. In June 2016, Kerry began working for MetLife as an Appeals Analyst, a position for which she had applied while still employed with Sun Life. DSMF ¶ 88.

## DISCUSSION

Plaintiff asserts two counts or claims in her Amended Complaint. In the first count, Plaintiff claims Defendant is liable for whistleblower retaliation. In the second count, Plaintiff claims Defendant failed to provide her with a reasonable accommodation. Through its Motion for Summary Judgment, Defendant argues the record lacks evidence to support the claims and that it is, therefore, entitled to judgment as a matter of law.

Summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). As cautioned by the Supreme Court, "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247-48 (1986). A material fact is one that has the potential to determine the outcome of the litigation. *Id.* at 248; *Oahn Nguyen Chung v. StudentCity.com, Inc*., 854 F.3d 97, 101 (1st Cir. 2017). To raise a genuine issue of material fact, Plaintiff Kerry must demonstrate that the record contains evidence that would permit the finder of fact to resolve the material issues in her favor. *See Triangle Trading Co. v. Robroy Indus., Inc*., 200 F.3d 1, 2 (1st Cir. 1999)

("Unless the party opposing a motion for summary judgment can identify a genuine issue as to a material fact, the motion may end the case.").

As outlined below, I find Plaintiff has failed to raise genuine issues concerning facts that are material to her claims, and that Defendant is therefore entitled to summary judgment as a matter of law.

## I.   COUNT 1: WHISTLEBLOWER RETALIATION

The Maine Human Rights Act provides that "[i]t is unlawful employment discrimination . . . [f]or any employer to fail or refuse to hire or otherwise discriminate against any applicant for employment . . . because of previous actions taken by the applicant that are protected under [the Maine Whistleblowers' Protection Act]."  5 M.R.S.A. § 4572. Under the Maine Whistleblowers' Protection Act ("MWPA"), an employer is prohibited from discharging, threatening, or discriminating against an employee because the employee, "acting in good faith, . . . reports orally or in writing to the employer . . . what the employee has reasonable cause to believe is a violation of a law or rule adopted under the laws of [Maine], a political subdivision of [Maine] or the United States."  26 M.R.S.A. § 833(1)(A).

To survive a motion for summary judgment, the plaintiff must present a prima facie case of retaliation consisting of the following three elements: (1) engagement in activity protected by the MWPA; (2) imposition of an adverse employment action by the employer; and (3) a causal connection between the protected activity and the adverse employment action. *Cormier v. Genesis Healthcare LLC*, 2015 ME 161, ¶ 8, 129 A.3d 944; *Osher v. Univ. of Maine Sys.*, 703 F. Supp. 2d 51, 64 (D. Me. 2010).  "If the evidence in the summary

judgment record would allow a jury to find for the employee on each element of the employee's case, then the employer is not entitled to summary judgment." *Brady v. Cumberland Cty.*, 2015 ME 143, ¶ 39, 126 A.3d 1145.

Here, the record on summary judgment is insufficient to establish that Kerry engaged in protected activity under the MWPA. Consequently, Kerry has failed to establish a prima facie case of retaliation. As a natural consequence, I must grant summary judgment.

**A. Protected Activity**.

Under the MWPA, an employee's activity is "protected" if she has actually made a report and has "reasonable cause" to believe a violation of law or rule has occurred. 26 M.R.S.A. § 833(1)(A); *Harrison v. Granite Bay Care, Inc.*, 811 F.3d 36, 51 (1st Cir. 2016) (clarifying that a plaintiff must demonstrate their "report was made to shed light on and 'in opposition to' [the defendant]'s potential illegal acts."). Although the reported condition does not actually have to be unsafe or illegal, *see Higgins v. New Balance Athletic Shoe, Inc.*, 194 F.3d 252, 261–62 (1st Cir. 1999), the record must nevertheless "support a finding that [the plaintiff] reasonably believed some sort of fraud or illegality had occurred." *Fuhrmann v. Staples Office Superstore E., Inc.*, 2012 ME 135, ¶ 16, 58 A.3d 1083. In sum, a whistleblowing Plaintiff must demonstrate she had both "a subjective and objectively reasonable belief" that a violation occurred. *Cormier,* 2015 ME 161, ¶ 11, 129 A.3d 944; *Levitt v. Sonardyne, Inc.*, 918 F. Supp. 2d 74, 84 (D. Me. 2013).

Here, Kerry asserts she engaged in two instances of protected activity. First, she claims to have engaged in protected activity by reporting to Moya, Doherty, and HR

representatives "a violation of fair claims processing" and Moya's "failure to appropriately investigate the claim."  Opp. at 14 (Doc. No. 42, #1066).  Second, she claims to have engaged in protected activity when she "complained of retaliation from Moya for making the complaint about violating fair claims processes."  *Id.* at 15.

### *1. Reports/complaints regarding violations of "Fair Claims Act"*

Kerry's first claim of protected activity centers on her reports of an alleged violation of the Fair Claims Act.  On this count, Kerry argued that when Sun Life chose to forego additional investigation into whether the company would be entitled to pursue repayment of the benefits the claimant may have erroneously received, Sun Life was not adhering to "fair claims processes."  This claim fails.

Taken in the light most favorable to the Plaintiff, the record debatably establishes that Kerry sincerely believed Moya was violating some claims-handling standard, arguably set forth in law (i.e., the "Fair Claims Act"), as demonstrated by the concerns she raised with Moya, Doherty, and the Sun Life HR Department.[10]  However, a plaintiff's "subjective belief alone is insufficient to meet the WPA's 'reasonable cause' requirement." *Galouch v. Dep't of Prof'l & Fin. Regulation*, 2015 ME 44, ¶ 15, 114 A.3d 988.

Although earnest, Kerry's belief was nevertheless not objectively reasonable.  In coming to this conclusion, I acknowledge the employee is not absolutely required to cite

---

[10] Her proclaimed sincerity is somewhat undercut by her subsequent statements regarding the matter. For example, she later characterized the decision to deny the claim and not conduct further investigation as a "mistake." Rosenstein Decl. Ex. 2, 2 (Doc. No. 34-14, #947). On a separate occasion, she messaged Moya to say: "I did not think you advised her [the individual who made the decision to deny the claim] to do the wrong thing. Sorry if it came off like that." DSMF ¶¶ 33. Nevertheless, for purposes of Summary Judgment, I will accept she subjectively believed a violation had occurred.

the exact statute or rule she believes has been violated while engaging in protected activity. *Id*. However, Kerry fails to demonstrate by citation to authority that the Defendant had violated an established law or rule.[11] Instead, the Plaintiff refers only to "violations of the Fair Claims Act" without citation, which, as Defendant emphasizes, is not the name of a law recognized by the State of Maine or the federal government. As such, I must conclude "fair claims processing standards" represents aspirational guidelines designed to protect consumers coupled with the plaintiff's own personal compilation of best practices acquired over many years of experience in the insurance industry and does not, in fact, represent an established body of law. While the Defendant's actions may have deviated from the protocols adopted by Kerry's previous employers, it was not objectively reasonable for Kerry to conclude this deviation was illegal. Kerry provides no support upon which a reasonable jury could conclude that Sun Life's choice to forego the chance to collect repayment from the claimant—a choice that is actually beneficial to the claimant—was a violation of an established rule or law.

### 2. *Reports/complaints regarding violations of Whistleblower Protection Act*

Kerry's second claim of protected activity centers on her complaints of retaliation for reporting that Sun Life had violated the Fair Claims Act, and it likewise fails. Applying

---

[11] In an exhibit to her Affidavit, Kerry provided a copy of guidelines from the National Association of Insurance Commissioners ("NAIC") which provides guidance on "Fair Claims Practices and Procedures." However, as argued by the Defendant, these self-proclaimed "models" or "guidelines" are aspirational and only outline suggested business practices. They are not a compilation or restatement of established law or rules. As such, it is not reasonable to conclude a deviation from these "guidelines" constitutes a violation of law or rule. Furthermore, these guidelines are clearly developed to protect the individual insured from arbitrary determinations by an insurance company. Here, ironically enough, the insured was benefitted by Sun Life's choice to hold off on additional investigation.

the standards discussed above, even if Kerry had a subjective belief that she was reporting illegal activity—this time a violation of the WPA itself—that belief, alone, is insufficient to withstand the WPA's "reasonable cause" requirement.

### 3. Summary

Without first establishing that she engaged in activity protected under the MWPA, Kerry cannot assert a claim of retaliation under the MWPA. As Kerry has failed to present sufficient evidence in the summary judgment record to satisfy the prima facie elements of a MWPA claim, Defendant is entitled to summary judgment on the claim.

## II. COUNT 2: FAILURE TO ACCOMMODATE

The Maine Human Rights Act provides that "[t]he opportunity for an individual to secure employment without discrimination because of . . . physical or mental disability . . . is recognized as and declared to be a civil right" and that an employer "may not discriminate against a qualified individual with a disability because of the disability of the individual in regard to . . . [the] discharge of employees." 5 M.R.S. §§ 4571, 4572(2); *see also id*. § 4553(1-B) (defining "covered entity"). Under this standard, an employer's failure to make "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability" is a form of discrimination. *Id*. § 4553(2)(E).

To state a disability discrimination claim based upon a failure to accommodate under the MHRA, a plaintiff must allege facts sufficient to establish: "(1) [s]he is a handicapped person within the meaning of the statute; (2) [s]he is qualified to perform the essential functions of the job with or without reasonable accommodation; and (3) the

employer knew of [her] disability but did not reasonably accommodate it upon a request." *Morissette v. Cote Corp.*, 190 F. Supp. 3d 193, 210 (D. Me. 2016) (citing *Henry v. United Bank*, 686 F.3d 50, 59–60 (1st Cir. 2012)). As "interpretation of the ADA and of the Maine Human Rights Act have proceeded hand in hand," courts generally address claims of failure to accommodate under the MHRA using an American with Disabilities Act ("ADA") framework. *Carmichael v. Verso Paper, LLC*, 679 F. Supp. 2d 109, 123–24 (D. Me. 2010) (quoting *Soileau v. Guilford of Maine, Inc.,* 105 F.3d 12, 14 (1st Cir. 1997)); *Kelley v. Corr. Med. Servs., Inc.*, 707 F.3d 108, 115 n.12 (1st Cir. 2013) (internal citations omitted) ("Generally, disability-related claims under the MHRA are construed and applied along the same contours as the ADA."); *Pouliot v. Town of Fairfield*, 184 F. Supp. 2d 38, 51 (D. Me. 2002) (interpreting a MHRA failure to accommodate claim as analogous to an ADA claim); *Currie v. Indus. Sec., Inc.*, 915 A.2d 400, 404 (Me. 2007) ("Our construction of the MHRA . . . has been guided by federal law.").

The parties do not dispute whether Kerry was qualified to perform the essential functions of her job. However, the parties do contest whether the accommodation Kerry requested—transfer to a new manager—was because of a disability and whether it was a reasonable accommodation request. Because the summary judgment record fails to establish that Kerry needed an accommodation because of a disability or that she made a sufficiently direct and specific request for a reasonable accommodation, she has failed to establish facts sufficient for a reasonable jury to conclude Sun Life violated the MHRA when it refused to grant Kerry's request.

## A. "Disabled" Within Meaning of Statute

Under the MHRA, a "[p]hysical or mental disability" is a "physical or mental impairment that: (1) [s]ubstantially limits one or more of a person's major life activities; (2) [s]ignificantly impairs physical or mental health; or (3) [r]equires special education, vocational rehabilitation or related services." 5 M.R.S.A. § 4553-A(1). If a plaintiff fails to allege facts sufficient for a reasonable jury to find the alleged disorder meets any of these three severity requirements, then they have failed to establish they suffer from a "physical or mental impairment" for purposes of the MHRA. *See Rooney v. Sprague Energy Corp.*, 519 F. Supp. 2d 131, 134 (D. Me. 2007) (clarifying that the current version of the MHRA requires a plaintiff to demonstrate one of these three requirements); *see also Boutin v. Home Depot U.S.A., Inc.*, 490 F. Supp. 2d 98, 104 (D. Mass. 2007) (reasoning that it is unnecessary to determine whether a plaintiff's anxiety disorder constitutes a "mental impairment" for purposes of the ADA if the plaintiff fails to establish that the disorder substantially limits a major life activity).

### 1. *Substantial limitation on major life activity*

Under this first prong, I must consider whether Kerry's 'disability' of anxiety limits a "major life activity," which, under the ADA, includes activities such as eating, sleeping, learning, concentrating, thinking, or working. 29 C.F.R. § 1630.2(i).

In *Caez-Fermaint v. State Insurance Fund Corporation*, the United States District Court for the District of Puerto Rico was faced with the case in which the employer denied the employee's request to be exempt from a rotating schedule due to her diagnosed "generalized anxiety disorder and panic attacks." 286 F. Supp. 3d 302, 308 (D.P.R. 2017).

The court reasoned the plaintiff could be found "disabled" under the ADA because she alleged facts sufficient for a reasonable juror to find that her "generalized anxiety disorder and panic attacks substantially limit[ed] two major life activities: sleeping and concentrating." *Id.* at 313.

In *McCrea v. City of Dubuque*, the Iowa Court of Appeals adopted similar reasoning but determined that a plaintiff's "anxiety, while an impairment, did not rise to the necessary level of severity or interference with life activities to constitute a disability" because, utilizing an ADA rubric, the plaintiff did not identify "any major life activities—other than her specific workplace—that were affected by her anxiety" and because her disability "[did] not prevent [her] from performing 'a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills, and abilities.'" 899 N.W.2d 739 (Iowa Ct. App. 2017) (citing *McGuinness v. Univ. of New Mexico Sch. of Med.*, 170 F.3d 974, 978 (10th Cir. 1998)).

Kerry asserts she was diagnosed with intermittent anxiety and Sun Life does not contest this diagnosis. However, unlike the plaintiff in *Caez-Fermaint* and like the plaintiff in *McCrea*, Kerry fails to point to any major life activities or "activit[ies] of central importance to [her] daily li[fe]" that are substantially limited by her anxiety. *Calero-Cerezo v. U.S. Dep't of Justice*, 355 F.3d 6, 21 (1st Cir. 2004). Instead, like the plaintiff in *McCrea*, she asserts only that her specific role under the supervision of Moya was impacted. The record also makes it clear Kerry's anxiety did not rise to the level of "substantial impairment" because it did not prevent her from working generally or performing "a class of jobs" as her request was not for a new role, but only for a new

manager and she accepted a similar position following her termination from Sun Life. *See also, e.g., Davis v. Allstate Insurance d/b/a Allstate New Jersey*, 2018 U.S. Dist. LEXIS 115182, at *12 (D.N.J. Jul. 11, 2018) (holding that a plaintiff's "mental impairment was not long-term or substantially limiting" for purposes of the ADA because she "could perform her job so long as she was not supervised by [her current supervisor].").

### 2. *Significant impairment of physical or mental health*

Under the second prong, in order for a physical or mental disability to be considered "significant," it must "hav[e] an actual or expected duration of more than 6 months and impair[] health to a significant extent as compared to what is ordinarily experienced in the general population." 5 M.R.S.A. § 4553-A(2)(B).

Here, although Kerry alleges she was diagnosed with anxiety in 2012 or 2013, she does not argue that her anxiety impaired her physical or mental health to a "significant extent" and the record is likewise devoid of facts to establish any such argument.

### 3. *Special vocational rehabilitation*

As with the second prong, Kerry does not argue and the record does not support that her anxiety necessitates "special . . . vocational rehabilitation" under the third prong of 5 M.R.S.A. § 4553-A.

### 4. *Summary*

While Kerry may, in fact, suffer from anxiety, she has failed to allege facts sufficient to qualify her as "disabled" within the meaning of the statute. Because Kerry has not alleged facts sufficient to establish that her anxiety was severe enough to rise to the level

of a "disability" under the MHRA, she is unable to establish a prima facie case that Sun Life's refusal to transfer her to a new manager was discriminatory.

**B. Employer Knew of Disability, But Failed to Accommodate**

In a failure to accommodate claim, the plaintiff "bears the initial burden of making a sufficiently direct and specific request for accommodation, unless the employer otherwise knew that one was necessary." *Morissette*, 190 F. Supp. 3d at 210 (internal citation omitted); *Freadman v. Metro. Prop. & Cas. Ins. Co.*, 484 F.3d 91, 102 (1st Cir. 2007) (explaining that a plaintiff's request "must be sufficiently direct and specific," and "must explain how the accommodation requested is linked to some disability"). The First Circuit also considers whether the requested accommodation is reasonable and "would enable [a plaintiff] to perform the essential functions of her job." *Reed v. LePage Bakeries, Inc.*, 244 F.3d 254, 259 (1st Cir. 2001). If the plaintiff alleges facts sufficient to establish these requirements, the employer may attempt to show that the requested accommodation was not feasible and would impose an "undue hardship" on the company. *Calero–Cerezo*, 355 F.3d at 23 (citing *Reed*, 244 F.3d at 261).

In this case, the fact that Kerry requested an accommodation is not contested. It is clear Kerry believed transferring to a different manager would alleviate the stress or discomfort she felt from being supervised by Moya which, in her view, would enable her to perform her job more effectively.[12] Nevertheless, Kerry has not demonstrated the

---

[12] Establishing the effectiveness of a requested accommodation is clearly a portion of the plaintiff's burden, but it is a minimal portion of her burden: for "simply in explaining how her proposal constitutes an 'accommodation,' the plaintiff must show that it would effectively enable her to perform her job. That is precisely what an accommodation does." *Reed*, 244 F.3d at 259.

existence of a sufficiently direct and specific request for accommodation of a disability, let alone a reasonable request.

### 1. *Sufficiently direct and specific request*

To be considered "sufficiently direct and specific," an employee's request must "provide sufficient information to put the employer on notice of the need for accommodation" and "explain how the accommodation is linked to [the] plaintiff's disability." *Jones v. Nationwide Life Ins. Co.*, 696 F.3d 78, 89 (1st Cir. 2012). In *Carmichael v. Verso Paper, LLC*, the plaintiff's accommodation request was determined to be sufficiently direct and specific upon a showing that he had submitted two separate forms listing his work restrictions to his employer and had "specifically complained that the company was not accommodating his disability." 679 F. Supp. 2d 109, 133 (D. Me. 2010). In contrast, in *Reed v. LePage Bakeries, Inc*., an employee failed to prove she "ever sufficiently requested the accommodation" because the "only hint [the plaintiff] gave of any disability was a vague reference to her therapist, who on earlier occasions had sent notes . . . indicating [the plaintiff] was being seen for depression." 244 F.3d 254, 262 (1st Cir. 2001).

Throughout her interactions with Sun Life, Kerry repeatedly requested to be transferred to a new manager and even conditioned her return to work on reassignment. As support for this demand, she cited a litany of concerns ranging from retaliation to dishonesty on Moya's part. Most pertinent to this claim, Kerry argues that the summary judgement record "contains ample evidence from which a trier of fact could reasonably *infer* that the Plaintiff notified human resources that she had a disability" and that she

"made a reasonable request for accommodation regarding that disability." Opposition at 1-2 (Doc. No. 42, #1053-54) (emphasis added). However, Kerry's somewhat contradictory testimony[13] only establishes for purposes of summary judgment that she verbally notified Sun Life HR Representatives of her anxiety by stating that she "was having some anxiety about returning to work for somebody that threatened me that way." Kerry Dep. 140:12-141:8 (Doc. No. 24-1, #336-37). Kerry's vague statement of anxiety or distress is not sufficiently direct and specific enough to trigger Sun Life's duty to accommodate under the MHRA.[14]

### 2. *Reasonableness of request*

When considering whether Kerry's accommodation request was "reasonable," I must evaluate whether "on the face of things, [the accommodation] is feasible for the employer under the circumstances." *Reed*, 244 F.3d at 259. Importantly, the concept of reasonableness "constrains the plaintiff in what she can demand from the defendant." *Id.* A reasonable request must consider the burden or expense imposed on the employer—

---

[13] As emphasized by the Defendant, Kerry testified during her deposition that she did not request any accommodation for her medical condition, stating:

    Q. And you didn't request any accommodations for your medical conditions, correct?
    A. No.
    . . .
    Q. Your request to be reassigned to another manager was because you felt you were being retaliated against by Ms. Moya, is that correct?
    A. Yes
    Q. It had nothing to do with your medical condition, correct?
    A. After I was released from the doctor, yes, that's correct.
  Kerry Dep. 99:10-12, 122:20-123:2 (Doc. No. 24-1, #326, 332).

[14] Although Kerry was aware of Sun Life's Medical Accommodation Policy, she failed to comply with its requirements, which required her to submit documentation from her health care provider outlining the impact of a specific medical condition suffered by Kerry, a description of a recommended accommodation and its expected impact on Kerry's job performance, and an estimation of the length of time an accommodation would be required. DSMF ¶¶ 8-10.

outlandish requests cannot be considered reasonable. *Id.* ("A request that the defendant relocate its operations to a warmer climate, for example, is difficult to imagine as being "reasonable."). Additionally, the MHRA "does not affirmatively and independently establish a duty on an employer to identify reasonable accommodations for a disabled employee." *Carnicella v. Mercy Hosp.*, 2017 WL 3081900, at *5 (Me. July 20, 2017).

Kerry relentlessly demanded to be transferred to a different manager and refused to return to work unless her request was granted. I fail to see how this uncompromising stance was reasonable. In this case, the record establishes Moya was the only manager on the Behavioral Health Claims Team and there was no other manager to whom Kerry could be transferred within her department. Furthermore, under United States Equal Employment Opportunity Commission guidelines, an employer "does not have to provide an employee with a new supervisor as an accommodation." EEOC Guidance ¶ 33[15]; *see also Tuvell v. Int'l Bus. Machines, Inc.,* 2015 WL 4092614, at *9 (D. Mass. July 7, 2015), *aff'd*, 643 F. App'x 1 (1st Cir. 2016) (reaffirming that the ADA does not require an employer to assign an employee to a different supervisor as a reasonable accommodation); *Gaul v. Lucent Technologies, Inc.*, 134 F.3d 576, 579 (3d Cir. 1998) (establishing that an accommodation "request to be transferred away from individuals causing [a plaintiff] inordinate stress [is] unreasonable as a matter of law" for purposes of the ADA). Sun Life was not required to grant Kerry the accommodation of her choosing and instead repeatedly requested that Kerry return to work and engage in in-person meetings moderated by the HR team to

---

[15] The EEOC Guidance document entitled "Enforcement Guidance: Reasonable Accommodation and Undue Hardship Under the Americans with Disabilities Act," is published on the EEOC's webpage. https://www.eeoc.gov/policy/docs/accommodation.html.

resolve the conflicts between Moya and Kerry—a reasonable approach to resolving conflicts between employees. *See, e.g., Enica v. Principi*, 544 F.3d 328, 342 (1st Cir. 2008) ("an employer is neither required to provide an employee with an accommodation of her choice nor to create a new position for that employee*"); Williams v. HealthReach Network*, 2000 WL 760742, at *11 n.11 (D. Me. Feb. 22, 2000) ("the ADA . . . does not require an employer to . . . provide an employee an accommodation of the employee's choice"). Thus, on the summary judgment record, Kerry has failed to point to evidence that would support a finding that her accommodation request was reasonable.

### 3. Summary

Even if Kerry was able to establish she suffered from an anxiety disorder that impaired her ability to work, she failed to create a record indicating that she made a reasonable accommodation request that was "sufficiently direct and specific" and "explain[ed] how the accommodation [wa]s linked to [her] disability." *Jones,* 696 F.3d at 89.

Defendant is entitled to summary judgment on Kerry's MHRA claim.

## CONCLUSION

For the foregoing reasons, the Defendant's Motion for Summary Judgment is **GRANTED**.

**SO ORDERED.**

Dated this 15th day of January, 2019.

/s/ Lance E. Walker
**LANCE E. WALKER**
**UNITED STATES DISTRICT JUDGE**